**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4557-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

AHMAD H. HUSEIN, a/k/a
AHMAD HASAN HUSEIN,
AHMAD HUSEIN, and
YOUSEF HUSEIN,

     Defendant-Appellant.

_____

Argued February 9, 2022 – Decided September 8, 2022

Before Judges Gilson, Gooden Brown and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 18-05-0319.

Kayla Rowe, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Kayla Rowe, on the briefs).

Patrick R. McAvaddy, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Patrick R. McAvaddy, on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

Following a jury trial, during which defendant represented himself with stand-by counsel, defendant was convicted of two counts of first-degree robbery, one count of fourth-degree unlawful possession of a weapon, and one count of third-degree possession of a weapon for an unlawful purpose. The convictions stemmed from a spree of armed gas station robberies within a mile of each other in the early morning hours of April 26, 2017. Defendant was sentenced to an aggregate term of fifteen years' imprisonment, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant now appeals his convictions, memorialized in an April 18, 2019 judgment of conviction (JOC). For the reasons that follow, we affirm the convictions but remand for the limited purpose of determining whether the possession of a weapon for an unlawful purpose conviction merges.

I.

On May 2, 2018, defendant was charged in a Hudson County indictment with five counts of first-degree robbery, N.J.S.A. 2C:15-1(a)(3) (counts one

through five);[1] two counts of fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (counts six and seven); and two counts of third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4 (counts eight and nine). Subsequently, counts one, six, and eight were dismissed on the State's motion.

A seven-day trial was conducted in October 2018, during which the State produced numerous witnesses, including three of the robbery victims, the owner of the fourth gas station where a robbery allegedly occurred, the investigating police officers, and defendant's wife.[2] Surveillance videos of three of the robberies were also presented at trial, showing the suspect wearing black sneakers, a ski mask, and a gray sweater or hoodie, and driving a silver Mercedes with something covering the back plate and "missing a front license plate." Defendant testified on his own behalf. We summarize the salient facts from the trial record.

At approximately 3:00 a.m. on April 26, 2017, at the Conoco gas station at 720 Tonnelle Avenue in Jersey City, a "huge" "silver" car pulled up to a pump.

---

[1] Although the indictment originally charged defendant under N.J.S.A. 2C:15-1(a)(3), at trial, the judge granted the State's motion to amend the indictment to charge defendant under subsection (a)(2).

[2] All the robbery victims testified with the aid of an interpreter.

The driver asked the attendant, Amar Nath, to fill his tank. According to Nath, the driver then exited the car, "walk[ed] towards [Nath,] . . . pull[ed] a gun, and . . . said[,] give me money." Nath described the gun as "quite long," measuring about "a foot and a half." Nath testified that the gun was "in [the suspect's] bag . . . and [he] was pointing [the gun at Nath] from the bag."

Nath testified that he only had "about [fifteen] to [twenty] dollars in [his] pocket and [he] took the money out and showed [the driver] . . . [b]ut he did not take that money." Instead, the driver got back into his car. As the car was driving away, Nath noticed there was "a kind of paper" that was "cover[ing] the [license] plate, but it was raining and . . . the paper was wet." Nath "noted" the plate number through the wet paper and called the police.

That same morning, Baldweep Walia[3] was robbed at gunpoint while working at Power gas station at 362 Tonnelle Avenue in Jersey City. Walia testified that just before 3:00 a.m., a "silver" "Mercedes" pulled into the gas

---

[3] Walia is also identified as both Baldweep Singh and Valdeep Singh. The judge rejected defendant's claim that he was prejudiced by the misspelling of the victim's name in the indictment because the police reports identified the victim and provided notice of the charge. See State v. Spano, 128 N.J. Super. 90, 92 (App. Div. 1973) ("The purpose[s] of an indictment are: to enable a defendant to know that against which he must defend; to prevent an accusation in derogation of our interdiction of double jeopardy; and to preclude substitution by a trial jury of an offense for which the grand jury has not indicted.").

station.  As Walia was walking towards the car, the driver "stood near" him with a "silver" "pistol in his hand."  Walia described the suspect as five feet, eight or ten inches tall, wearing "a jacket and a hoodie."  Walia also testified that the suspect was wearing a face covering, preventing Walia from "observ[ing] his face."  Nonetheless, Walia described the suspect as white or Hispanic but could not remember the suspect's race.

According to Walia, the suspect told him to put his "hands up and [give him] . . . all [the] money" he had.  Walia gave the suspect the money he had in his pockets, which totaled about $295.  The suspect then "warned" Walia not to "call the police," or he would "come back and kill [him]."  Walia testified that before leaving, the suspect also took "two [or] three antifreeze" containers.  As the Mercedes was pulling away, Walia noticed the "plate number, which was covered with a . . . paper."  Walia testified that he did not call the police and he was not sure who did, but later that morning, he received a call from his "boss" telling him to complete a police report.

The same morning, sometime between 3:00 and 4:00 a.m., a third robbery occurred.  Sukhvir Singh testified that he was working his shift as a gas attendant at Delta at 403 Tonnelle Avenue in Jersey City when a man pulled his car up to a pump.  According to Singh, the driver exited the car, said "give me all your

5

cash," "pushed [Singh,] and took . . . all the cash in [his] pockets," which totaled approximately $250 to $300. Singh could not recall what the car looked like and did not remember what the suspect was wearing but recalled that the suspect's "entire face was covered with a mask." Singh described the suspect as tall and skinny, with a "whitish" complexion like his. Singh could not remember "whether [the man] was carrying a weapon or not" but testified that "his arm was covered by a cloth and he kind of pushed something into [Singh's] body." Singh explained that he did not see the car's license plate because "[i]t was all covered" and "taped."

Bhupinder Thind testified that a similar robbery occurred at his gas station around the same time. According to Thind, at approximately 3:00 a.m. on April 26, he received a phone call from his employee, Harbant Singh, alerting him to a robbery that had just taken place at his Delta gas station located at 823 Tonnelle Avenue in Jersey City. The employee told Thind the perpetrator was driving a "white truck."

Jersey City Police Detective David Murawinski was one of the investigating officers. He testified that at around 3:00 a.m. on April 26, 2017, he responded to a report of an armed robbery at 720 Tonnelle Avenue. According to Murawinski, upon arrival, he looked at surveillance video, and

spoke with the victim. Murawinski learned that the robber was driving a four-door silver Mercedes and brandishing a gun. The victim gave Murawinski the license plate number of the Mercedes and described the robber as a "six[-]foot [-]two, light to medium skinned male wearing a gray hooded sweatshirt and a ski mask." While at the scene, Murawinski received two more phone calls reporting "armed robber[ies]" at nearby "gas station[s]." Murawinski went to those locations and reviewed surveillance videos showing the suspect driving what appeared to be the same "silver" "Mercedes."

Armed with that information, through a database search, Jersey City Police Detective Mark D'Ambrosia discovered that the vehicle used in the armed robberies was registered to "Jsmeen Abada." On the morning of April 26, 2017, D'Ambrosia and other officers located the Mercedes at Abada's home address and conducted visual surveillance. At approximately 12:05 p.m. that day, a female and a male fitting the description of the robbery suspect exited the home, entered the Mercedes, and drove away.

The officers followed the couple and conducted a motor vehicle stop at a red-light intersection. As the officers approached the vehicle, D'Ambrosia saw "a black duffel bag with a silver barrel of a handgun sticking out from it" located on the rear passenger seat of the Mercedes. A subsequent search of the car

revealed that the gun "was a paintball gun." Officers also discovered "three bottles of antifreeze" and "[a] black ski mask" inside the Mercedes.

Police detained the couple and transported them to the police station for questioning. The male was identified as defendant and Abada's husband. At the police station, Abada reviewed "surveillance footage" of the robberies. While watching the footage, she identified the Mercedes as "[her] car," and noticed "[t]he masked man" was wearing "a sweater" that she had seen on her "couch that morning." She also testified that the suspect's shoes on the video that "had a paint mark on [them]" were "in [her] kitchen." Additionally, she identified a "blue bag" in the video that she had seen "on [her] couch."

Abada testified that after she was questioned, officers asked her for "[c]onsent to [s]earch . . . [the] apartment" she shared with defendant and informed her of "her right to refuse." Abada stated she "agreed" to the search and "signed [the] consent [form]." D'Ambrosia was not in the room when Abada consented to the search. However, he testified that there were standard procedures involved in consent searches that included "read[ing] the person [his or her] rights" and informing the person of his or her right to refuse. D'Ambrosia also testified that the detectives had complied with the procedures by presenting Abada with a consent-to-search form. The consent form provided that the signer

"voluntarily and without threats or promises of any kind" authorized detectives to conduct the search, "having been informed of [his or her] constitutional right not to have a search made of the [premises] without a search warrant and also of [his or her] right to refuse to consent to such a search."

Abada testified that after signing the consent form, she escorted the officers to her home and directed the officers "to the sneakers . . . [i]n the kitchen" belonging to defendant. Abada stated that she knew the sneakers belonged to defendant because "nobody else [came] in the house besides him," and "he had those sneakers for over [sixteen] months." Additionally, Abada said "there was paint on [the sneakers, and t]wo weeks prior" defendant had been "painting the kitchen."

Abada identified the sneakers at trial, as well as "the gray sweater and . . . the . . . blue bag that was . . . on the couch," all of which were recovered from the search of her home and admitted into evidence. She further testified that although the sweater was "baggy" and not something defendant "would wear . . . to go out," she saw it on the couch for "two to three days," and defendant "said it [was] his." Abada also testified that on the night of the robberies, sometime between "three" and "four" a.m., defendant got out of "bed to go get

9

Orajel" for a toothache. According to Abada, at "4:16 a.m.," she called defendant on the telephone to ascertain his whereabouts.

Abada could not recall what time defendant returned home but testified that defendant was "[i]n the bedroom," before she headed to work that morning, and no one else stayed over at the apartment that night. Abada also confirmed seeing three bottles of antifreeze in the car and the license plate turned over when she headed to work.

After the State rested, defendant moved for a judgment of acquittal pursuant to Rule 3:18-1. Applying the governing standard enunciated in State v. Reyes, 50 N.J. 454, 458-59 (1967), the trial judge denied the motion. Thereafter, defendant testified on his own behalf, asserting a third-party guilt defense. Defendant explained that a week before the robberies, his "friend, Carlos Ramos, called [him] and indicate[d] that he needed to use [defendant's] car. So [defendant] gifted [his] car that night." According to defendant, later that night, when Ramos returned the car, defendant was painting his kitchen and Ramos agreed to help. In the process, Ramos "splashed [paint] on himself and then dropped paint on his shoes."

Defendant testified that a week later, on April 25, 2017, Ramos sent defendant another "text message[]" asking to borrow the car again. Defendant

"put the [car] key in the mailbox" and notified Ramos. At some point later that night, Ramos picked up the car and defendant went to bed. However, defendant had a bad toothache and was unable to sleep. At around 3:40 a.m., defendant "received a message from . . . Ramos saying [he was] outside." At first, defendant did not respond. When Ramos texted him again asking whether he "want[ed him] to put the key in the mailbox," defendant went outside to speak to Ramos, and the two went to "an Exxon Gas Station" about "a block and a half" away "to buy Orajel" and pain medication for defendant's toothache.

According to defendant, when he and Ramos returned to defendant's apartment at about 4:00 a.m., Ramos asked defendant to give him a haircut and defendant, who was a barber by profession, agreed. Once inside the apartment, Ramos removed his sweater and "put it on the couch." After the haircut, as Ramos was leaving, he "begg[ed]" defendant to switch shoes with him because of "the paint on his shoes." Defendant acquiesced and allowed Ramos to take a pair of his shoes. In return, Ramos paid defendant forty dollars and "left [his paint covered] shoes [by] . . . the front door" of the apartment. Ramos also "forg[o]t his sweater on the couch."

Defendant testified that later that morning, while driving his wife to work, he observed "three bottles of anti[-]freeze" in his car, and was "surprised that

11

[Ramos had] bought [him] three [containers of] anti-freeze." He also noticed that his rear license plate "was a little played with," so he "just fixed it . . . [to] make sure it d[id not] fall [off]" because he was already missing "the plate number in the front" from "going to the car wash."

Defendant testified that after he was arrested and "advised that [his] car was used in a robbery," he immediately told the officers that "at the time of the robbery[,] somebody else, a Spanish guy, had [his] car," referring to Ramos. Defendant stated he offered his phone as proof of the text messages between him and Ramos. According to defendant, although the officers took his phone, they never returned it. As a result, defendant claimed he did not have access to the text or call logs between him and Ramos that would prove his version of events. On cross-examination, defendant refused to acknowledge that no text or call logs were extracted or recovered from his phone.

Defendant testified that about a month after he was arrested, he recorded a telephone conversation between himself and Ramos. Defendant produced the following recording, which was played for the jury:

> [DEFENDANT]: Yo, what happened when I gave you my car? They say my car was used in a robbery.
>
> [RAMOS]: How do they know it was your car?
>
> [DEFENDANT]: They say they got the plate number.

[RAMOS]: No, that's not possible, man.

[DEFENDANT]: Why did you use my car?

[RAMOS]: (Indiscernible).

[DEFENDANT]: What do you mean you (indiscernible).

[RAMOS]: (Indiscernible).

[DEFENDANT]: (Indiscernible). What are you going to do right now?

[RAMOS]: You had nothing to do with it. Don't worry.

[DEFENDANT]: Don't worry? What do you mean I had nothing to do with it? They say (indiscernible) my car.

[DEFENDANT]: (Indiscernible), Bro. (Indiscernible). Why you didn't tell me this? (Indiscernible). (Indiscernible).

[RAMOS]: (Indiscernible). You'll be fine.

[DEFENDANT]: (Indiscernible) the blood in the car. I told you no. Uh-huh.

On cross-examination, when the prosecutor asked defendant for Ramos's phone number, defendant replied, "[r]ight now I really don't remember." When pressed, defendant responded he could not remember but recalled that it was "a 201 number." Defendant also testified that he subpoenaed Ramos and recalled that Ramos had two addresses, "West New York and Jersey City." However,

13

when pressed, defendant could not recall either address. Additionally, defendant acknowledged having "three prior conviction[s], two fourth[-] degree and one third[-] degree," from ten years ago.

Jury deliberations began on October 17, 2018. During deliberations, the jury asked whether defendant could "try on the hoodie and the sneakers." The judge denied the request, explaining that he could not "supplement the record" after the parties had rested. On October 19, 2018, the jury returned a verdict of guilty as to count two (robbery of Nath), count five (robbery of Walia), count seven (unlawful possession of a weapon), and count nine (possession of a weapon for an unlawful purpose). The jury found defendant not guilty of count three (robbery of Sukhvir Singh) and count four (robbery of Harbant Singh).

Following the jury's verdict, defendant moved to dismiss the indictment as defective because his copy was not signed. The judge showed defendant his signed copy of the indictment and denied the motion. Defendant also moved for a new trial, R. 3:20-1, and a judgment of acquittal, R. 3:18-2, both of which were denied. On April 18, 2019, defendant was sentenced to two concurrent fifteen-year terms of imprisonment, each with an eighty-five percent period of parole ineligibility under NERA, on the robbery convictions (counts two and five), and a concurrent three-year term on the possession of a weapon for an unlawful

14

purpose conviction (count nine). The judge merged the unlawful possession of a weapon conviction (count seven) into count nine.

On appeal, in his counseled brief, defendant raises the following points for our consideration:

> POINT I
>
> THE WARRANTLESS SEARCH OF [DEFENDANT'S] APARTMENT WAS ILLEGAL, BECAUSE . . . ABADA'S CONSENT TO THE SEARCH WAS NOT KNOWING AND VOLUNTARY. [(NOT RAISED BELOW).]
>
> POINT II
>
> THE TRIAL COURT ERRONEOUSLY DENIED [DEFENDANT'S] <u>REYES</u> MOTION AND, LATER, HIS ACQUITTAL MOTION, BECAUSE THE PROSECUTION FAILED TO MOUNT SUFFICIENT EVIDENCE AS TO EACH ROBBERY.
>
> > A. The <u>Reyes</u> Motion
> >
> > B. The Acquittal Motion
> >
> > C. Standard of Review
> >
> > D. There Was Insufficient Evidence For a Reasonable Jury to Find [Defendant] Guilty Beyond a Reasonable Doubt, And, Consequently, This Court Must Reverse And Order [Defendant's] Acquittal

POINT III

IN THE ALTERNATIVE, THE TRIAL COURT SHOULD HAVE GRANTED A NEW TRIAL, BECAUSE NO ONE EVER IDENTIFIED [DEFENDANT] AS THE ROBBER AT ANY OF THE FOUR LOCATIONS AND NO FORENSIC EVIDENCE PROVED HE WAS INVOLVED.

POINT IV

[DEFENDANT'S] SENTENCE WAS EXCESSIVE AND IMPROPER, BECAUSE THE COURT FAILED TO RECOGNIZE APPLICABLE MITIGATING FACTORS AND OVER-EMPHASIZED CERTAIN AGGRAVATING FACTORS, RESULTING IN THE INAPPROPRIATE WEIGHING OF AGGRAVATING AND MITIGATING FACTORS.  (Not raised below).

In a pro se supplemental brief, defendant raises the following arguments:

POINT I

THE PROSECUTOR ELICITED IMPROPER LAY-WITNESS OPINION TESTIMONY AS TO THE CONTENT OF THE SURVEILLANCE VIDEO AND THE SHOES AND THE HOODIE WAS PLAIN ERROR, REQUIRING REVERSAL OF [DEFENDANT'S] CONVICTIONS.

POINT II

THERE IS CLEARLY INSUFFICIENT EVIDENCE THAT EITHER; IF THERE WAS A ROBBERY AT ALL, OR THAT . . . NATH WAS EVER ROBBED AT ANY POINT, ALSO THERE IS CLEARLY INSUFFICIENT EVIDENCE THAT [DEFENDANT'S] VEHICLE AND THE SHOES AND

16

THE GRAY HOODIE [WERE] INVOLVED AS TO WHAT . . . NATH TESTIFIED TO[] AT TRIAL.

POINT III

THE PROSECUTOR WITHH[ELD] EXC[UL]PATOR[Y] AND MATERIAL EVIDENCE OF [DEFENDANT'S] INNOCENCE, AND WRONGLY SHIFTED THE BURDEN TO PROVE, PRESENT OR PRODUCE THE[] EVIDENCE ON [DEFENDANT] WHICH VIOLATED HIS RIGHT OF DUE PROCESS TO A FAIR TRIAL.

POINT IV

THE CUMULATIVE EFFECT AND IMPACT OF ALL THE ERRORS DENIED [DEFENDANT] A FAIR TRIAL REQUIRING REVERSAL OF HIS CONVICTIONS.

II.

In Point I of his counseled brief, defendant argues, "the fruits of the warrantless search of [his] apartment" should have been suppressed because "no efforts were made to explain [Abada's] constitutional right to refuse consent." Thus, defendant asserts "[t]he State failed to show by clear and convincing evidence that . . . Abada knowingly and voluntarily consented to the search."

Defendant did not move to suppress the evidence on this basis at the time of trial. A defendant waives his right to object to the admission of evidence "on the ground that such evidence was unlawfully obtained" if he fails to move for

17

its suppression before trial.  R. 3:5-7(f); see also State v. Martin, 87 N.J. 561, 566 (1981) ("Failure to make a timely motion [to suppress pursuant to Rule 3:5-7] results in a waiver of a defendant's right to object to the evidence's admission at trial."); State v. Jenkins, 221 N.J. Super. 286, 292 (App. Div. 1987) ("It is now well established that constitutional claims, such as Fourth Amendment rights, may be waived unless properly and timely asserted."); State v. Cox, 114 N.J. Super. 556, 559-60 (App. Div. 1971) ("R[ule] 3:5-7 is strictly adhered to" and "[i]f timely motion is not made, a defendant is deemed to have waived any objection to the admission of the evidence.").

"Appellate review is not limitless."  State v. Robinson, 200 N.J. 1, 19 (2009); see, e.g., Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) ("[O]ur appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959))).

To be sure, "appellate courts retain the inherent authority to 'notice plain error not brought to the attention of the trial court[,]' provided it is 'in the interests of justice' to do so."  Robinson, 200 N.J. at 20 (alteration in original)

(quoting R. 2:10-2).  Likewise, appellate courts may address errors "'clearly capable of producing an unjust result,'" despite "the absence of an objection" at trial.  Ibid. (quoting R. 1:7-5).

However,

> these exceptions are not without practical boundaries; they are not intended to supplant the obvious need to create a complete record and to preserve issues for appeal.  To permit otherwise would allow the "clearly capable of producing an unjust result"/"interests of justice" standard of Rule 2:10-2 to render as mere surplusage the overarching requirement that matters be explored first and fully before a trial court.
>
> [Ibid. (quoting R. 2:10-2).]

Where the issue was "never . . . raised before the trial court, . . . its factual antecedents" were "never . . . subjected to the rigors of an adversary hearing," and "its legal propriety" was "never . . . ruled on by the trial court, the issue was not properly preserved for appellate review."  Id. at 18-19.

To support his belated Fourth Amendment legal challenge, defendant posits "[n]o witness testified they gave . . . Abada a full explanation of what she was agreeing to" when she signed the consent to search form.  Defendant points out that although "[t]he State presented a signed Consent Form at trial" and D'Ambrosio testified about the police protocol for obtaining a person's consent

19

to search, "D'Ambrosio was not present in the interview room when . . . Abada supposedly consented to the search."

For that very reason, the record contains insufficient factual information to address the specific issue raised for the first time on appeal. We note that Abada herself testified at trial and confirmed that her consent was knowing, voluntary, and unequivocal. When asked why she and the detectives went to her apartment following the interview, Abada testified, "I volunteered[,] and I also signed a consent [for] them to search the house." See State v. Sugar, 100 N.J. 214, 234 (1985) ("A valid consent to a search must be clear, knowing, voluntary, unequivocal, and express."). Nonetheless, given the factual shortcomings in the record to evaluate the claim in an informed and deliberate manner, we decline to consider the issue. See Robinson, 200 N.J. at 21 ("Given this record, an appellate court should stay its hand and forego grappling with an untimely raised issue.").

## III.

In Points II and III of his counseled brief as well as Point II of his pro se supplemental brief, defendant argues the verdict was against "the weight of the evidence" and "was based on insufficient evidence . . . because no one ever identified [defendant] as the robber at any of the gas stations" and the State

"failed to present any physical evidence, such as fingerprints or DNA, that connected [defendant] to the scene of the crime." Defendant posits, "the State's witnesses' testimony describing the robber did not support the finding that [defendant] was the robber" because defendant, who testified he was born in Jerusalem, "is not Hispanic, and . . . speaks with a Middle Eastern accent." According to defendant, his explanation about lending the car to Ramos, "a Spanish guy," provided a reasonable basis for "finding that [defendant] did not commit the robbery." Thus, defendant contends the judge erred in denying his motions for judgment of acquittal pursuant to Rules 3:18-1 and -2, as well as his motion for a new trial pursuant to Rule 3:20-1.

"Rule 3:18-1 provides that a court must enter a judgment of acquittal after the close of the State's case or after the close of the defendant's case if 'the evidence is insufficient to warrant a conviction.'" State v. Lodzinski, 249 N.J. 116, 143 (2021). "Rule 3:18-2 is an additional safeguard, authorizing a court to enter a judgment of acquittal even after the return of a verdict of guilty, when the evidence does not rationally support a conviction." Ibid. "The power to enter a judgment of acquittal cannot be invoked because a judge has a mere difference of opinion with the outcome of a trial; it can be invoked only to prevent a miscarriage of justice." Id. at 143-44.

We "apply the same standard as the trial court to decide if the trial judge should have granted a judgment of acquittal." State v. Sugar, 240 N.J. Super. 148, 153 (App. Div. 1990). "That standard is the same whether the motion is made at the close of the State's case, at the end of the entire case, or after a jury returns a guilty verdict under Rule 3:18-2." State v. Fuqua, 234 N.J. 583, 590 (2018). A motion for a judgment of acquittal will not be granted if:

> the evidence, viewed in its entirety, be it direct or circumstantial, and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt.
>
> [Id. at 590-91 (quoting State v. Kluber, 130 N.J. Super. 336, 341-42 (App. Div. 1974)).]

"On such a motion the trial judge is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." Kluber, 130 N.J. Super. at 342. "[A] jury may draw an inference from a fact whenever it is more probable than not that the inference is true; the veracity of each inference need not be established beyond a reasonable doubt in order for the jury to draw the inference." State v. Brown, 80 N.J. 587, 592 (1979); see State v. Williams, 218 N.J. 576, 594 (2014) (applying that standard after the close of the defendant's case under Rule 3:18-

1); Reyes, 50 N.J. at 458-59 (applying that standard after the close of the State's case under Rule 3:18-1).

Turning to a motion for a new trial, which may be granted "if required in the interest of justice," Rule 3:20-1 further provides in pertinent part:

> The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

"In considering whether a jury verdict was against the weight of the evidence, our task is to decide whether 'it clearly appears that there was a miscarriage of justice under the law.'" State v. Smith, 262 N.J. Super. 487, 512 (App. Div. 1993) (quoting R. 2:10-1). "We must sift through the evidence 'to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'" Ibid. (quoting State v. Carter, 91 N.J. 86, 96 (1982)). "But an appellate court may not overturn the verdict 'merely because it might have found otherwise upon the same evidence.'" Ibid. (quoting State v. Johnson, 203 N.J. Super. 127, 134 (App. Div. 1985)).

"On a motion for a new trial, the objective is not to second-guess the jury but to correct [an] injustice that would result from an obvious jury error." State

23

v. Saunders, 302 N.J. Super. 509, 524 (App. Div. 1997). Thus, "[a]ppellate intervention is warranted only to correct an 'injustice resulting from a plain and obvious failure of the jury to perform its function.'" Smith, 262 N.J. Super. at 512 (quoting Johnson, 203 N.J. Super. at 134). "Where the jury's verdict was grounded on its assessment of witness credibility, a reviewing court may not intercede, absent clear evidence on the face of the record that the jury was mistaken or prejudiced." Ibid. Indeed, "[a] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)).

Here, we discern no basis for appellate intervention. Defendant acknowledges that "[t]he State mounted sufficient evidence for a reasonable jury to believe that the robberies took place" but "failed to present sufficient evidence that [defendant] was the person who committed the robberies." See N.J.S.A. 2C:15-1(a)(2).[4] Although no one identified defendant as the robber, the State presented compelling circumstantial evidence tying defendant to the robberies,

---

[4] On appeal, defendant does not challenge the sufficiency of the evidence pertaining to the weapons offenses.

including a physical description of the robber that matched defendant, a car captured on surveillance footage at the crime scenes that was linked to defendant, and items recovered in the car and in defendant's apartment connecting defendant to the robberies. It has long been recognized that circumstantial evidence alone may be sufficient to sustain a conviction if, as here, it enables the jury to find beyond a reasonable doubt a defendant's guilt of the charges. See State v. Mayberry, 52 N.J. 413, 437 (1968) ("[I]ndeed in many situations circumstantial evidence may be 'more forceful and more persuasive than direct evidence.'" (quoting State v. Corby, 28 N.J. 106, 119 (1958))).

Defendant also contends that his third-party guilt defense was a "more reasonable" explanation. However, "[t]he jury is free to believe or disbelieve a witness's testimony," Saunders, 302 N.J. Super. at 524, and "[t]he jury . . . did not have to accept the defense version," State v. Meneses, 219 N.J. Super. 483, 487 (App. Div. 1987). We are satisfied the judge properly denied defendant's motions for acquittal and a new trial.

IV.

In Point IV of his counseled brief, defendant argues the judge "imposed an excessive sentence" despite the judge's "comments about [defendant's] apparent decency." He further contends that the "excessive sentence was based

25

on aggravating factors that inappropriately magnified the importance of a prior disorderly persons conviction and ignored sufficient credible evidence of certain mitigating factors."

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, based on the risk of re-offense, defendant's extensive prior criminal record that potentially qualified him as a "persistent offender," and the heightened need for deterrence, the judge found aggravating factors three, six, and nine. See N.J.S.A. 2C:44-1(a)(3), (6), and (9). The judge found no mitigating factors and determined "the aggravating factors clearly outweigh[ed] the mitigating." Nonetheless, the judge sentenced defendant at the midpoint of the sentencing range for a first-degree crime. See N.J.S.A. 2C:43-6(a)(1); see

26

also State v. Natale, 184 N.J. 458, 488 (2005) (stating that although "no inflexible rule applies, . . . when the aggravating factors preponderate, sentences will tend toward the higher end of the [sentencing] range"). The judge also denied the State's motion to sentence defendant as a persistent offender under N.J.S.A. 2C:44-3(a), and imposed concurrent, rather than consecutive, sentences as authorized under N.J.S.A. 2C:44-5(a).

In sentencing defendant, the judge considered defendant's four prior indictable convictions for burglary, theft, shoplifting, and filing a false report, as well as his two prior disorderly persons offenses, stating:

> [Defendant's] prior convictions are fourth degrees and a third degree. And he's got disorderly persons offenses. . . . [A]nd he didn't rack them up in one year. They're over a period of time. He's [thirty-two] years old, a period of about [twelve] years. So those are not all that serious. I don't think anyone would consider those to be the most serious of crimes. They're not second or first degrees.
>
> But the two that [defendant was] convicted now of are about as serious as they get.

Regarding mitigating factors, the judge acknowledged that defendant "seem[ed] like a nice enough man" and had "a young child." However, the judge explained that simply having "young kids" without more did not justify "not send[ing some]one to jail" because "[t]hat would mean even the people who did

the most heinous things in the world could never go to jail." Further, according to the judge, defendant's apparent "mild mannered and respectful" behavior in the courtroom laid in stark "contrast" to the serious crimes of which he was convicted.

Defendant's argument that the judge should have found mitigating factor eleven simply because defendant had a young child is unpersuasive. See N.J.S.A. 2C:44-1(b)(11) ("[I]mprisonment of the defendant would entail excessive hardship to himself or his dependents."); see also State v. Locane, 454 N.J. Super. 98, 129 (App. Div. 2018) (noting mitigating factor eleven only applies in cases where a defendant's dependents would suffer adverse circumstances "different in nature than the suffering unfortunately inflicted upon all young children whose parents are incarcerated"). Equally unpersuasive is defendant's argument that the judge's positive comments about defendant's demeanor should have resulted in the judge finding mitigating factor nine, notwithstanding the judge having found defendant posed a risk of re-offense. See N.J.S.A. 2C:44-1(b)(9) (providing the "character and attitude of the defendant indicate that the defendant is unlikely to commit another offense"). Thus, we are satisfied the sentence comports with the sentencing guidelines, is

amply supported by the credible evidence in the record, and does not shock the judicial conscience.

The judge did not merge the possession of a weapon for an unlawful purpose conviction (count nine) into either of the robbery convictions. Instead, the judge imposed a concurrent three-year term of imprisonment. Based on the record before us, it appears defendant possessed the weapon solely for the purpose of committing the robberies for which he was convicted. However, that decision should be made by the judge on remand based on the trial proofs and the verdict sheet, which was not provided in the record. See State v. Diaz, 144 N.J. 628, 636 (1996) ("When the only unlawful purpose in possessing the gun is to use it to commit the substantive offense, merger is required."). We therefore affirm the sentences imposed on the robbery convictions but remand for the limited purpose of determining the merger issue.

V.

In his pro se supplemental brief, defendant has presented a number of arguments. We dispose of them summarily: (1) the State did not elicit "improper lay-witness opinion testimony" regarding "the shoes and the gray hoodie" on the "surveillance video" during its examination of Abada, see State v. Singh, 245 N.J. 1, 19-20 (2021) (concluding that the police witness's lay

29

witness opinion testimony regarding the similarities between the sneakers from the surveillance footage and the sneakers the defendant was wearing satisfied N.J.R.E. 701 because the witness "had first-hand knowledge of what the sneakers looked like, having seen them on [the] defendant" and "his testimony was helpful to the jury"); (2) the prosecutor's comments during summation did not constitute prosecutorial misconduct, see State v. Frost, 158 N.J. 76, 82 (1999) ("Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented."); (3) Abada's testimony did not contravene N.J.R.E. 501, see N.J.R.E. 501(2)(a) ("The spouse . . . of the accused in a criminal action shall not testify in such action . . . unless . . . such spouse . . . consents."); (4) the judge did not err in denying the jury's request to have defendant try on the hoodie and shoes when defendant did not try on the items during the trial, see Fiorino v. Sears Roebuck & Co., 309 N.J. Super. 556, 568 (App. Div. 1998) ("[N]oting that the jurors' 'reenactment . . . of a demonstration presented to the jury during the course of the trial,' was 'not such as to amount to the reception of new evidence by the jury,' because this was 'merely a duplication of what had occurred during the trial in the court room'") (second alteration in original) (quoting Wachtendorf v. Harkins & Co., 518 S.W.2d 599, 602 (Tex. Civ. App.

30

1974)); (5) the State did not improperly withhold exculpatory information allegedly contained in defendant's cell phone, see State v. Martini, 160 N.J. 248, 270 n. 5 (1999) ("[T]here can be no Brady [v. Maryland, 373 U.S. 83, 87 (1963)] violation where the accused or his counsel knows before trial about the information and makes no effort to obtain its production."); and (6) the cumulative error doctrine does not apply here because the alleged errors complained of by defendant, if error at all, do not constitute reversible error, see State v. Wakefield, 190 N.J. 397, 538 (2007) (holding despite defendant's "repeated assertions of trial error . . . no appreciable error was present," thus rejecting defendant's claim of cumulative error).

To the extent we have not addressed specific arguments raised in this appeal, we conclude they lack sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(2). In sum, we affirm the convictions and sentence imposed on counts two and five, but remand for the limited purpose of determining whether count nine merges into count two or five, and, if so, to amend the JOC to vacate the separately imposed concurrent sentence.

Affirmed and remanded for the limited purpose of determining the merger issue. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4557-18